**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMMONWEALTH OF THE NORTHERN          :
MARIANA ISLANDS,
         Plaintiff,

                             :

    v.

                             :     No. 11 MISC 00099

WILLIAM H. MILLARD,

                             :

        Defendant

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMMONWEALTH OF THE NORTHERN          :
MARIANA ISLANDS,
         Plaintiff,

                             :

    v.

                             :

PATRICIA H. MILLARD,          :     No. 11 MISC 00100

        Defendant.          :

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CANADIAN IMPERIAL BANK OF COMMERCE'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TURNOVER ORDER

Scott D. Musoff
Timothy G. Nelson
Gregory A. Litt
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel: (212) 735-3000

Attorneys for Third-Party Garnishee
*Canadian Imperial Bank of Commerce*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT .......................................................................................................................... 6

I. CIBC CANNOT BE COMPELLED TO TURN  OVER PROPERTY OR DEPOSITS
IT DOES NOT HAVE ........................................................................................................ 6

    A.    Under New York Law, CIBC Cannot Be Compelled to Turn Over
        Property or Deposits That Are in the Possession of Its Subsidiaries ...................... 6

        1.    A Garnishee Is Only Obligated to Turn Over Property in Its Own
            Possession. ................................................................................................. 6

        2.    Plaintiff Has Failed to Cite a Single Authority Requiring a Third
            Party Garnishee to Turn Over Assets Held by a Foreign Subsidiary .......... 9

    B.    The Present Application Is an End-Run Around  the Cayman Equivalent
        of the "Revenue Rule" ......................................................................................... 11

II. THE INFORMATION REQUESTS MADE OF CIBC, TO THE EXTENT THEY
SEEK INFORMATION BEYOND CIBC, ARE IMPROPER ......................................... 12

    A.    As CIBC Does Not Possess Property or Deposits of the Millards, It Should
        Not Be Required to Make Any Further Response to the Information
        Requests .............................................................................................................. 12

    B.    In All Events, CIBC Lacks the Requisite Control Needed  to Furnish
        Customer Information in First Cayman's Possession ........................................... 13

    C.    In all Events, First Cayman is Barred as a Matter of  Cayman Law From
        Supplying the Requested Information to CIBC ................................................... 15

III. ON ADMITTED FACTS THERE IS NO BASIS FOR VEIL-PIERCING ........................... 16

IV. IN ALL EVENTS, PLAINTIFF HAS FAILED TO SERVE PROPER  NOTICES ON
THE ENTITY IN POSSESSION OF JUDGMENT  DEBTOR'S PROPERTY,
THEREBY INVALIDATING ANY RESTRAINT .......................................................... 19

CONCLUSION ..................................................................................................................... 21

## TABLE OF AUTHORITIES

### CASES

*Al Sayegh Brothers Trading (LLC) v. Doral Trading and Export, Inc.*,
219 F. Supp. 2d 285 (E.D.N.Y. 2002) ......................................................................... 18

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001) ...................................................................................... 12

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964) .................................................................................................. 12

*Baratta v. Kozlowski*,
94 A.D.2d 454, 464 N.Y.S.2d 803 (2nd Dep't 1983) ................................................ 17

*Butler v. Stagecoach Group, PLC*,
72 A.D.3d 1581, 900 N.Y.S.2d 541 (3d Dep't 2010) ................................................ 18

*Republic of Colombia v. Diageo North America Inc.*,
531 F. Supp. 2d 365 (E.D.N.Y. 2007) ....................................................................... 12

*In re Crespo*,
123 Misc. 2d 862, 475 N.Y.S.2d 319 (Sup. Ct. N.Y. County 1984) ........................... 20

*Cruz v. TD Bank, N.A.*,
No. 10 Civ. 8026, 2012 WL 694267 (S.D.N.Y. Mar. 2, 2012) ................................... 19

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003) .................................................................................................... 8

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007) .................................................................................... 8-9

*European Community v. RJR Nabisco, Inc.*,
424 F.3d 175 (2d Cir. 2005) ..................................................................................... 12

*Gallant v. Kanterman*,
198 A.D.2d 76, 603 N.Y.S.2d 315 (1st Dep't 1993) .................................................... 8

*Gucci America, Inc. v. Li*,
No. 10 Civ 4974(RJS), 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) ....................... 2, 9

*JPMorgan Chase Bank, N.A. v. Malarkey*,
65 A.D.3d 718, 884 N.Y.S.2d 787 (3d Dep't 2009) .................................................... 8

*John Wiley & Sons, Inc. v. Kirtsaeng,*
No. 08 Civ. 7834 (GEL)(DCP), 2009 WL 3003242 (S.D.N.Y. Sept. 15, 2009).........20

*Koehler v. Bank of Bermuda Limited,*
12 N.Y.3d 533, 911 N.E.2d 825, 883 N.Y.S.2d 763 (2009) ...................................2, 10

*McAnaney v. Astoria Financial Corp.,*
665 F. Supp. 2d 132 (E.D.N.Y. 2009).........................................................................17

*Midland Funding LLC v. Singleton,*
935 N.Y.S.2d 844 (Dist. Ct. Nassau County 2011)....................................................19

*Motorola Credit Corp. v. Uzan,*
No. 02 Civ. 666(JSR)(FM), 2003 WL 203011 (S.D.N.Y. Jan. 29, 2003)..............13-14

*Oppenheimer & Co. v. Deutsche Bank AG,*
No. 09 Civ. 8154 (LAP), 2010 WL 743915 (S.D.N.Y. Mar. 2, 2010)...................17-19

*Pappas & Marshall v. A.J. Ross Logistics, Inc.,*
222 A.D.2d 424, 634 N.Y.S.2d 717 (2d Dep't 1995) ..................................................20

*River Seafoods, Inc. v. JPMorgan Chase Bank, N.A.,*
19 A.D.3d 120, 796 N.Y.S. 2d 71 (1st Dep't 2005)......................................................7

*SEC v. Credit Bancorp, Ltd.,*
194 F.R.D. 469 (S.D.N.Y. 2000) ................................................................................13

*Samsun Logix Corp. v. Bank of China,*
31 Misc. 3d 1226(A), 2011 N.Y. Slip Op. (Sup. Ct. N.Y. County 2011) ..................10

*Société D'Assurance De L'Est SPRL v. Citigroup Inc.,*
No. 10 Civ. 4754(JGK), 2011 WL 4056306 (S.D.N.Y. Sept. 13, 2011)....................17

*In re Vivendi Universal, S.A. Securities Litigation,*
02 Civ. 5571 (RJH)(HBP), 2009 U.S. Dist. LEXIS 131833 (S.D.N.Y. July 10,
2009).....................................................................................................................13-15

## STATUTES

Fed. R. Civ. P. 45(a)(1)(A)(ii) ........................................................................................13

N.Y. CPLR 5222(b) (McKinney Supp. 2012).....................................................................7

N.Y. CPLR 5222-a(b) (McKinney Supp. 2012)................................................................19

N.Y. CPLR 5225(b) (McKinney 1997) .......................................................................2, 6, 7

## MISCELLANEOUS

David D. Siegel, *New York Practice* §§ 508, 510 (5th ed. 2011) ........................................7

Third-party garnishee Canadian Imperial Bank of Commerce ("CIBC") respectfully submits this Memorandum of Law in Opposition to Plaintiff's Application for a Turnover Order, brought on by this Court's March 5, 2012 Ex Parte Order to Show Cause, Temporary Restraining Order, and Order Granting Other Relief (the "OSC").[1]

## PRELIMINARY STATEMENT

In a dramatic overreach, especially on an *ex parte* basis, Plaintiff mischaracterizes and misstates the case law and the facts in an attempt to restrain accounts at First Caribbean International Bank (Cayman) ("First Cayman") through service on CIBC, which is a 92% shareholder of First Cayman's corporate parent. Recognizing that the Cayman Islands would not enforce a tax Mariana Islands judgment (just like the United States would not enforce a foreign tax judgment) and that First Cayman is subject to Cayman banking confidentiality laws, Plaintiff seeks to end run Cayman law and jurisdiction by serving its indirect parent, CIBC in New York on the legally unsustainable premise that accounts held at First Cayman's are "property" in CIBC's possession.[2]

The fundamental problem in this case is that ***the Millards do not have any accounts with***

---

[1]  This Opposition Memorandum also refers to: (1) Plaintiff's March 5, 2012 Memorandum of Law in Support of its Motion for Turnover Order Pursuant to N.Y. CPLR § 5225(b), Order to Show Cause Why Preliminary Injunction Should Not be Entered and Ex Parte Application for Temporary Restraining Order against Garnishee Canadian Imperial Bank of Commerce ("Pl. Mem."); (2) the March 5, 2012 Declaration of Michael S. Kim in support of Plaintiff's current application ("Kim Decl."); and (3) the accompanying Declarations of Elizabeth Aylett ("Aylett Decl."), Laura Hatfield ("Hatfield Decl.").

[2]  Because Plaintiff's application only purports to identify assets located in the Cayman Islands (*see, e.g.*, Kim Decl. ¶¶ 17, 19 & Ex. 5), we only address the situation with respect to First Cayman and its affiliate Trust Company (Cayman) Limited ("Cayman TrustCo"). Even had Plaintiffs suggested that the Millards had accounts at other FirstCaribbean affiliate banks (e.g., FirstCaribbean's subsidiaries operating as banks in Trinidad and Tobago, Anguilla or St Kitts & Nevis), the exact same objections to a turnover order would still apply.

**CIBC**.  CIBC is thus not in a position to "turn over" any of the Millards' property.  CIBC likewise cannot disclose account information it does not possess.  New York CPLR 5225(b), upon which Plaintiff relies authorizes a judgment creditor to seek the turnover of a judgment debtor's property only if its in possession of that property.  Moreover, CPLR 5225(b) does *not* provide an avenue to compel a company to turn over assets held by one of its subsidiaries.  Indeed, Plaintiff has failed to cite a single case in which a court in New York ordered a garnishee to turn over property in the possession of its subsidiary.[3]

While some (but by no means all) courts, in the wake of the New York Court of Appeals decision in *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009), have permitted CPLR 5225(b) to be utilized to restrain out-of-country accounts in a bank by serving a branch of that same bank located in New York, Plaintiff cites no case – nor are we aware of any – that permits service on a New York branch of a bank that owns *a different bank* in order to restrain accounts at that separate and different bank.  Indeed, perhaps recognizing this, the bulk of Plaintiff's brief is devoted to CIBC and its activities in New York and not First Cayman's or its parent's activities.

In an effort to convince Judge Cote, who was the Part I judge, to enter the *ex parte* order to show cause that includes an overbroad restraint, Plaintiff relied heavily on Judge Sullivan's recent decision in *Gucci America, Inc. v. Li*, No. 10 Civ 4974(RJS), 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011).   Plaintiff asserted that "just like here, the assets the plaintiff sought to garnish were held by a subsidiary of the garnishee bank in a separate country." (Pl. Mem. at 16).  This is

---

[3]    In its papers, Plaintiff asserts (in conclusory fashion) that CIBC "[u]nquestionably . . . has the control, power, authority and practical ability to order CIBC FirstCaribbean to turn over funds on deposit in the name of the Millards." (Pl. Mem. at 13.)  This is not only factually wrong (*see infra* p. 5), but also legally unfounded, as Plaintiff has not pointed to a single case under CPLR 5225(b) that holds that property in the hands of a foreign subsidiary is subject to the turnover statute.

simply not true.  As is apparent from the face of the decision and confirmed by the papers

submitted there (all of which are publicly available), *Gucci* involved serving a branch of the

same bank that held the accounts at issue – not a subsidiary like here.  *Gucci* thus provides no

support for Plaintiff's position and should not have been cited in this manner.

Indeed, Plaintiff's application suffers from numerous legal flaws that mean that a turnover

order could never be justified in this case:

- As mentioned above, CIBC cannot be ordered to turn over assets in a separate and different bank located in the Cayman Islands;

- Likewise, in the discovery context, a third party can only be compelled to provide documents or other information that is within its possession, custody or control.  CIBC has no right to access information regarding the Millards' accounts, if any, maintained by CIBC's foreign subsidiaries.

- Plaintiff has failed to comply with the letter of CPLR Article 52 by never properly serving all of the required documents upon CIBC, thus rendering any restraint void.

- Additionally, Plaintiff has failed to serve any notices or forms upon the entity that it alleges possesses the property at issue, making any restraint invalid.

For these reasons and as further described below, CIBC respectfully submits that no preliminary

injunction should be issued and the current TRO should be vacated.

## STATEMENT OF FACTS

On March 5, 2012, Plaintiff filed an order to show cause in the United States District

Court for the Southern District of New York seeking a turnover order against CIBC, to attempt

to enforce a default judgment rendered against defendants William and Patricia Millard in the

United States District Court for the District of the Northern Marianas Islands.  The judgment

apparently relates to unpaid taxes allegedly owed to Plaintiff.  (Kim Decl. ¶11)  The New York

offices of CIBC received a copy of the order to show cause on March 7, 2012.  (Aylett Decl. ¶ 2)

Plaintiff's Memorandum of Law and accompanying declaration do not assert that *CIBC* is

3

in possession of any property or accounts belonging to Defendants. Indeed, neither Defendants nor any of the entities specified in Plaintiff's application hold accounts or other assets at CIBC. Plaintiff instead asserts that Defendants have accounts at "***CIBC FirstCaribbean in the Cayman Islands***." (Pl. Mem. at 5 (emphasis added).)

In actuality, the entities identified by Plaintiff as "***CIBC FirstCaribbean in the Cayman Islands***" are separate corporate entities, twice removed from CIBC.

- ***CIBC***, the sole respondent in this application, is a Canadian bank with an office in New York;

- ***CIBC FirstCaribbean International Bank Limited*** ("FirstCaribbean") is a partially-owned subsidiary of CIBC, incorporated and organized under the laws of Barbados. (Aylett Decl. ¶ 4.) CIBC owns approximately 92% of FirstCaribbean's issued and outstanding shares, with the remainder traded on various stock exchanges throughout the Caribbean. (*Id.* ¶ 4.)

- FirstCaribbean does not offer deposit accounts in the Cayman Islands, but two of its wholly-owned subsidiaries operate in the Caymans: ***CIBC First Caribbean International Bank (Cayman) Ltd ("First Cayman")*** and ***CIBC Bank and Trust Company (Cayman) Limited ("Cayman TrustCo")***. (Aylett Decl. ¶ 7.)

The relationship between these companies is set forth in graphic form below.



Each of these companies are legally separate and independent entities. FirstCaribbean does not function as a branch of CIBC. (*Id.* ¶ 5) The two publicly-traded companies, CIBC and FirstCaribbean, have distinct boards of directors, which meet separately. (*Id.* ¶ 5) FirstCaribbean and CIBC do not have an information sharing agreement, and CIBC is unable to access accounts or account information held by FirstCaribbean or its subsidiaries. (*Id.* ¶ 8.)

Likewise, both First Cayman and Cayman TrustCo are separately incorporated under the laws of the Cayman Islands, and each holds their own license to operate as a retail bank, issued by the Cayman Islands Monetary Authority. (*Id.* ¶ 7.) CIBC has no information sharing agreement with First Cayman or Cayman TrustCo and is wholly incapable of controlling or freezing any accounts held by First Cayman or Cayman TrustCo. (*Id.* ¶ 8.)[4]

Neither First Cayman nor Cayman TrustCo is subject to the laws of the United States, but both are subject to the stringent banking secrecy laws of the Cayman Islands. (Hatfield Decl. ¶ 15. Ex. C.) The Cayman Islands legal system is a common law system. (*Id.* ¶ 8.) Under Cayman law, separately-incorporated companies such as First Cayman and Cayman TrustCo possess distinct legal identities and they cannot be required to turn over property in satisfaction of a turn over order directed to their independent parent company. (*Id.* ¶¶ 15-17.) Additionally, Cayman law requires banks to keep customer information confidential and imposes strict penalties for violating this obligation or for disclosing customer information without a local court order. (*Id.* ¶¶ 18-20.) As a consequence, it would be a violation of Cayman Islands law for a Cayman banks, such as First Cayman and Cayman TrustCo, to disclose confidential customer

---

[4] FirstCaribbean also has subsidiaries in other Caribbean jurisdictions, including Trinidad & Tobago, St Kitts & Nevis and Anguilla. As the current application only addresses alleged Cayman Islands accounts, the discussion is confined to First Cayman and Cayman TrustCo. Nevertheless, if other FirstCaribbean entities or branches were in dispute, the same principles and legal conclusions as discussed in this application would apply to such entities. .

information to its parent companies or shareholders. (*Id.* ¶ 20.)

As far as CIBC is aware, Plaintiff has made no effort to serve FirstCaribbean, First Cayman or Cayman TrustCo in this matter. Moreover, despite a lengthy discussion in Plaintiff's Memorandum of Law of a possible basis for jurisdiction in this court over CIBC, Plaintiff has not made any effort to establish a basis for this court to exercise jurisdiction over FirstCaribbean, First Cayman or Cayman TrustCo. As a consequence, FirstCaribbean, First Cayman and Cayman TrustCo are not parties to the present application and would not be subject to any turnover order as requested by Plaintiff.

## ARGUMENT

### I.
### CIBC CANNOT BE COMPELLED TO TURN OVER PROPERTY OR DEPOSITS IT DOES NOT HAVE

**A.   Under New York Law, CIBC Cannot Be Compelled to Turn Over Property or Deposits That Are in the Possession of Its Subsidiaries**

    **1.   A Garnishee Is Only Obligated to Turn Over Property in Its Own Possession.**

N.Y. CPLR 5225(b) states:

**§ 5225.  Payment or delivery of property of judgment debtor**

**(b) Property not in the possession of judgment debtor.** Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff. Costs of the proceeding shall not be awarded against a person who did not dispute the judgment debtor's interest or right to possession. Notice of the proceeding shall

6

also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested. The court may permit the judgment debtor to intervene in the proceeding.    The court may permit any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239.

N.Y. CPLR 5225(b) (McKinney 1997) (emphasis added).

By its terms, CPLR 5225(b) thus only contemplates that a turnover order being sought against a garnishee that in fact possesses property belonging to the judgment debtor, or as stated in CPLR 5222(b), regarding restraining notices, is "in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest". N.Y. CPLR 5222(b) (McKinney Supp. 2012).  It follows that if a garnishee neither possesses any property of the judgment debtor nor is obligated to pay any sum to the judgment debtor, then CPLR 5222(b) is incapable of application. *See* David D. Siegel, *New York Practice* § 508 (5th ed. 2011); *see also, River Seafood Inc. v. J.P. Morgan Chase Bank*, 19 A.D.3d 120, 122 (1st Dep't 2005) ("[A] bank may not be held liable for violating a restraining notice: 1) where the bank has not opened an account for a judgment debtor, 2) where the bank does not possess property in which the judgment debtor has an interest, and 3) where any other third party does not then (i.e. at the time of service of the notice) owe a debt to the judgment debtor."); *Gallant v. Kanterman*, 198 A.D.2d 76, 78 (1st Dep't 1993) ("A bank or transfer agent not in possession of property in which the judgment debtor has an interest, or owing any debt to said judgment debtor, at the time of service of the notice, cannot be held liable for violation of the restraint.").

Here, CIBC does not maintain any accounts for the judgment debtors, possess any property belonging to the judgment debtors, or owe any debt to the judgment debtors.  Indeed, Plaintiff has not attempted to allege that *CIBC* possesses any of the Millards property or holds any deposits from the Millards.  Rather, Plaintiff alleges only that CIBC holds an indirect 92%

equity interest in a company (First Cayman) that allegedly holds deposits for the Millards (or their nominee entities). Merely owning shares in First Cayman, however, does not put CIBC in the shoes of First Cayman – and thus the possibility that First Cayman holds "property" or deposits of the Millards does not mean that CIBC qualifies as a proper garnishee under CPLR 5225(b). *See JPMorgan Chase Bank, N.A. v. Malarkey*, 65 A.D. 3d 718, 721 (3d Dep't 2009); *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary."); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 476 (2d Cir. 2007) (referring to the notion that a parent corporation does not own or have legal title to a subsidiary's assets as a general principle of corporate law).

*EM Ltd.* is highly illustrative here. In that case, judgment creditors of the Republic of Argentina attempted to issue restraining notices under CPLR 5222 upon eight garnishee banks arising out of the Republic of Argentina's alleged failure to pay certain of its debt obligations. *EM Ltd.*, 473 F.3d at 468-69. The notices were directed in part to Banco Central, a banking entity that, although owned by the State, was separately incorporated. *Id.* at 465-66. While the district court, acting *ex parte*, initially granted the attachment and restraining notices directed against Banco Central accounts, it later held that the assets of Banco Central were presumptively *not* available to creditors of the Republic of Argentina. *Id.* at 468-70. Affirming the decision to vacate the notices, the Second Circuit noted that under New York law, the party who possesses property is presumed to be the party who owns it. *Id.* at 473-74. The Second Circuit reasoned that, even assuming Argentina possessed the ability to control and direct Banco Central to use its assets for the benefit of the Republic, this still did not change the ownership of those assets from

8

Banco Central to Argentina itself. *Id.* at 475. In coming to this conclusion, the court noted that several general principles of corporate law supported this contention, including the concepts that a parent does not own the assets of its subsidiaries and that shareholders are prohibited from transferring or assigning corporate properties and rights. *Id.* at 475-76.

This case presents an even starker example of corporate separateness and the principle that property in the hands of a subsidiary (here, First Cayman) is not property in the hands of its shareholder (here, CIBC). *See Id.* at 475-76. Not surprisingly, this principle of corporate separateness is also observed in the Cayman Islands, where the pertinent remote subsidiaries are located. (Hartfield Decl. ¶¶ 15-17.) Thus, the relief requested by Plaintiff clashes with New York law under Article 52 of new York's Civil Practice Law and Rules and established principles of corporate law, and it should be denied.

### 2. Plaintiff Has Failed to Cite a Single Authority Requiring a Third Party Garnishee to Turn Over Assets Held by a Foreign Subsidiary

In light of clear New York law that a garnishee cannot be compelled to restrain or turn over assets that are not in its possession, it is no surprise that Plaintiff has failed to cite a single case in which a court ordered a third party to turn over assets held outside the United States by one of its foreign subsidiaries.

To fill the obvious gap in the law underlying its claims, Plaintiff resorts to mischaracterizing Judge Sullivan's recent decision in *Gucci America, Inc. v. Li*, No. 10 Civ. 4974(RJS) 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011). Referring to the *Gucci* decision, Plaintiff asserts that, "just like here, the assets the plaintiff sought to garnish were held by *a subsidiary of the garnishee bank* outside of the United States." (Pl. Mem. at 16 (emphasis added).) That simply is not true. In *Gucci*, the defendants had assets on deposit with the Bank of China *in China*, and the order restraining the assets was served on "*a New York City branch*"

9

of the Chinese bank, not a separately incorporated *subsidiary*. *Gucci*, 2011 WL 6156936 at *1-2 (emphasis added).[5]

Moreover – and once more overlooked by Plaintiff, *Gucci* involved a completely different procedural context, as it involved a *pre-judgment preliminary injunction*. *Id.* at *1. Tellingly, *Gucci* expressly distinguished pre-judgment preliminary relief from the post-judgment enforcement context.    Judge Sullivan acknowledged that "following an entry of default judgment," which apparently was anticipated, "the separate entity rule" might limit the court's "authority to reach assets located abroad." *Id.* at *4 n.6.

This is a highly significant observation, as the separate entity rule is a New York rule under which "each branch of a bank [must] be *treated as a separate entity* for attachment purposes." *Samsun Logix Corp. v. Bank of China*, No. 105262/10, 2011 WL 1844061 at *2 (Sup. Ct. N.Y. County May 12, 2011) (emphasis added). Strictly speaking, the "separate entity" rule need not be applied here, because FirstCaribbean and its subsidiaries are separately incorporated companies (and separately-licensed banks) as a matter of undeniable fact, not merely by operation of law.  In all events, the discussion of the "separate entity" rule reveals that the *Gucci* decision on pre-judgment preliminary relief against an unincorporated bank branch is wholly inapposite to the case at bar.

Plaintiff's reliance on *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533 (2009), is similarly misplaced.  In *Koehler*, the New York Court of Appeals held that a court can "order a

---

[5]    Indeed, the court specifically discussed the "separate entity rule," a rule that allows an unincorporated bank branch to be *treated* as a separate entity for certain purposes. *Gucci*, 2011 WL 6156936 at *4 n6. *See also* Supplemental Memorandum of Law of Nonparty Bank of China Concerning the Appropriateness of a Post Judgment Turnover Order at 8, *Gucci America Inc. v. Li*, No. 10 Civ. 4974(RJS) 2011 WL 1231039 (S.D.N.Y. filed Jan. 20, 2011) (discussing the significance of the fact that it maintained a bank branch in New York rather than a separate subsidiary).

defendant, other than the judgment debtor himself, to deliver assets into New York, **when the court has personal jurisdiction** over the defendant but the assets are not located in New York." *Id.* at 536-37 (emphasis added). Critical to the holding in *Koehler* was the fact that Bank of Bermuda Limited ("BBL"), which itself held the judgment debtor's assets in Bermuda, had unequivocally *consented* to the New York courts' jurisdiction. The Court of Appeals explained:

> BBL argued before the District Court that service upon the New York bank did not subject BBL to the personal jurisdiction of the court. Although this jurisdictional issue was the subject of litigation in federal court for some 10 years, *BBL eventually consented, by letter dated October 9, 2003, to the personal jurisdiction of the court* as of the time that Koehler had commenced the proceeding.

*Id* at 536 (emphasis added).

In sharp contrast, the Cayman entities in this case have not been served, are not parties to the present CPLR 5225(b) application and are thus not subject to the jurisdiction of the courts of New York. There simply is no basis under *Koehler* to award relief against First Cayman or Cayman TrustCo, much less to subject them to a turnover over by the improper means of seeking relief against their indirect parent, CIBC.

**B.     The Present Application Is an End-Run Around
the Cayman Equivalent of the "Revenue Rule"**

One might reasonably ask why Plaintiff does not go to the Cayman Islands to enforce its judgment against the Millards. The answer is that such an action would be barred as a matter of law, because the Cayman Courts – just like those of the United States – bar the enforcement of foreign revenue judgments. (Hatfield Decl. ¶ 25) (citing *Wahr-Hansen v. Compass Trust Co. Ltd.*, (Grand Ct.), 2007 CILR 55). Because the present case involves a territorial government seeking to recover unpaid taxes in a civil suit, it is quite unlikely that Cayman Courts would enforce the present judgment. (Hatfield Decl. ¶ 26). The position would be no different if the UK or Canadian tax authorities tried to enforce a tax judgment here. As the Second Circuit has

11

explained, there is a "longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 109 (2d Cir. 2001); *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 413 (1964) (noting that most U.S. jurisdictions adhere to the principle that "a court need not give effect to the penal or revenue laws of foreign countries"); *European Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 175 (2d Cir. 2005); *Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp.2d 365, 383 (E.D.N.Y. 2007).

The fact that this application is an attempt to end-run around the revenue rule as upheld by Cayman Islands courts -- the exact same rule as would be applicable here if the situation were reversed -- militates further against the grant of relief in this case.

## II.
### THE INFORMATION REQUESTS MADE OF CIBC, TO THE EXTENT THEY SEEK INFORMATION BEYOND CIBC, ARE IMPROPER

**A.    As CIBC Does Not Possess Property or Deposits of the Millards, It Should Not Be Required to Make Any Further Response to the Information Requests**

As explained above, and as Plaintiffs apparently knew at the time this application was brought, CIBC itself does not hold property or deposits of the Millards. The only purpose, therefore, of the wide-ranging document requests made of CIBC is in aid of an attempted turnover order against its foreign subsidiaries, First Cayman and CaymanTrustCo. As demonstrated above, however, any application for a turnover order against these foreign entities is completely without merit and is contrary to the express provisions of CPLR 5225(b). On this basis alone, CIBC's existing response (that it does not have account information itself) should be deemed sufficient.

**B.    In All Events, CIBC Lacks the Requisite Control Needed
to Furnish Customer Information in First Cayman's Possession**

Even if the legal shortcomings in Plaintiff's application were not dispositive, its application for information in First Cayman's hands should be denied on the grounds that such information is not within CIBC's possession, custody or control.   Even outside of the narrow CPLR Article 52 context, courts do not order third parties to produce documents and information held by their subsidiaries absent a sufficient finding of control.   As a matter of law and practicality, CIBC plainly lacks the control needed to turn over any of the documents requested by Plaintiff.

When a corporation is asked to produce documents from an affiliate, the court must determine whether the nature of the relationship between the two entities is such that, as a practical matter, the entity that was served may obtain the requested information from its affiliate. *See In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH)(HBP), 2009 U.S. Dist. LEXIS 131833, at *18-21, 26-30 (S.D.N.Y. July 10, 2009) (holding that a French bank did not have sufficient control over its wholly-owned Luxembourg subsidiary, which was subject to banking secrecy laws).   A non-party thus may be required to produce only those materials within that non-party's "possession, custody or control." Fed. R. Civ. P. 45(a)(1)(A)(iii).   This inquiry is guided by whether the non-party has the legal right, authority or practical ability to obtain the requested document "upon demand." *SEC v. Credit Bancorp, Ltd.,* 194 F.R.D. 469, 471 (S.D.N.Y. 2000).   The particular form of a corporate relationship does not determine whether a parent has the ability to obtain documents from a subsidiary. *Id.* at 472.   Rather, courts inquire whether the subpoenaed entity was given access to documents or information in "the ordinary course of business." *Motorola Credit Corp. v. Uzan,* 02 Civ. 666 (JSR)(FM) 2003 U.S. Dist. LEXIS 1215 at *20 (S.D.N.Y. Jan. 29, 2003).

13

Plaintiff makes no serious effort to establish that CIBC has control over customer information in the hands of its foreign subsidiaries First Cayman and CaymanTrustCo. Instead, Plaintiff relies entirely on the existence of a parent/subsidiary relationship and conclusory statements of control to argue that CIBC must be deemed to have control over the customer information requested. This approach fails to recognize that in the regular course of business, CIBC has no power or legal ability to request information of the sort Plaintiff seeks from FirstCaribbean or its subsidiaries. (*See* Aylett Decl. ¶¶ 8-9.) Furthermore, the Cayman entities where the information allegedly resides are subject to strict Cayman Islands banking confidentiality laws and, accordingly, are legally barred from furnishing the requested information to CIBC. (*See* Hatfield Decl. ¶¶ 18-20.)

Courts in this Circuit have found that information was beyond the control of a parent bank under circumstances where the relationship was even closer than this case. In *Motorola*, UBS froze accounts located in New York, but did not produce documents located in Switzerland. *Motorola*, 2003 U.S. Dist. LEXIS 1215 at *18. The district court held that UBS's New York *branch* did not have access in the ordinary course of business to information about UBS accounts or banking relationships outside the United States. *Id.* at *20. The facts here are even more compelling: CIBC does not have the ability, in ordinary course of its business, to obtain or turn over account or customer information held by a separately incorporated and separately licensed foreign bank, First Cayman. (*See* Aylett Decl. ¶ 8-9.)

The *Vivendi* decision also is instructive. There, the New York branch of a French bank was requested to provide documents from its wholly-owned subsidiary in Luxembourg, which was subject to bank secrecy laws in that jurisdiction. *Vivendi*, 2009 U.S. Dist. LEXIS 131833, at *18-21. The court considered the following criteria: 1) the degree of ownership and control

14

exercised by the parent over its subsidiary, 2) a showing that the two entities operate as one, 3) demonstrated access to documents in the ordinary course of business, and 4) an agency relationship. *Id.* at 25-29. In applying these considerations, the court noted that the existence of common board members and stock ownership were not sufficient to find control. *Id.* at *26-27. The court also found that there had been no showing of overlap in the day-to-day operations of the two entities and rejected the contention that consolidated financial figures proved that the two companies shared information in the regular course of their business. *Id.* at * 27-28.

Here Plaintiff relies on the same relationship factors that were rejected as insufficient to establish control in *Vivendi*: stock ownership, some overlap in personnel and the apparent integration of the companies in published reports. (Pl. Mem. at 13.) Plaintiff fails to allege any facts that would show that CIBC has a right to access or demand the information Plaintiff seeks. Plaintiff's attempt to obtain the requested information through CIBC, rather than directly from the entity that purportedly holds the information, should be denied.

## C.    In all Events, First Cayman is Barred as a Matter of Cayman Law From Supplying the Requested Information to CIBC

As a matter of law, First Cayman is prohibited by Cayman Islands law from providing CIBC access to customer deposits or account information. (Aylett Decl. ¶¶ 8-9.) Under Cayman banking law, all banks have a strict common law duty of confidentiality. (Hatfield Decl. ¶¶ 18-21.) This duty prohibits banks, such as First Cayman and Cayman TrustCo, from disclosing the identity and bank account details of their customers without first obtaining their customers' consent. (Hatfield Decl.¶ 20.)

The common law duty is bolstered by the statutory duty created under the Confidential Relationship (Preservation) Law (2009 Revisions). (Hatfield Decl. ¶ 21, Ex. 5) Under this Cayman Islands statute, it is a serious criminal offense for a person to divulge "confidential

15

information" without either the consent of the information owner, or prior judicial authorization. (*Id.* ¶ 19)  "Confidential information" is defined in the statute as information "concerning any property" given to a recipient who is not allowed to disclose it without permission of the "principal" unless the disclosure is in "the normal course of business."  (Hatfield Decl., Ex. 5.) . This duty applies even when the recipient is called upon to testify or otherwise produce information concerning "confidential information" in or in connection with any legal proceedings conducted in any jurisdiction.  (Hatfield Decl. ¶ 19-20 )[6]

It also bears emphasis that  a bank that fails to abide by Cayman statutes or fails to abide by basic duties, including customer confidentiality, risks adverse action by the Cayman Islands Monetary Authority.  (*Id.* ¶ 21.)  This regulator occupies a position similar to that of the Bank of England or the U.S. Federal Reserve System.  (*Id.* ¶ 21.)  Thus, the facts show that information about confidential customer relationships simply cannot be extracted from First Cayman in the manner that Plaintiff suggests.

### III.
### ON ADMITTED FACTS THERE IS NO BASIS FOR VEIL-PIERCING

Acknowledging that CIBC does not possess any of the judgment debtors' assets or information, Plaintiff asks the Court to disregard the corporate form and order CIBC to use its alleged control over FirstCaribbean to force FirstCaribbean's Cayman Islands subsidiaries to turn

---

[6]    Under Cayman Islands law, there are two exceptions to a banker's common law and statutory duty of confidentiality.  (Hatfield, Decl. ¶ 20.)  The first is that a bank may disclose information if required by law (for example, pursuant to a request by a Cayman islands regulator with proper jurisdiction, or an order by a Cayman court).  (*Id.* ¶ 20.)  The second exception permits disclosure in order to defend claims brought by a customer.  (*Id.* ¶ 20.)  Neither of these exceptions, however, allow a bank to divulge confidential information to a third party where another person (such as a person holding shares in the bank) is subject to a court order in a non-Cayman jurisdiction.  (*Id.* ¶ 20.)

over the Millards' property and information.  In so doing, Plaintiff relies on the mere fact of

CIBC's shareholding in FirstCaribbean, limited overlap in personnel, and public pronouncements

of the close relationship between the parties.  These ordinary incidents of a parent-subsidiary

relationship cannot provide a basis for the extraordinary remedy of piercing the corporate veil.

It is a fundamental tenet of corporate law that the corporate form provides protection of

property unless two entities ignore that corporate form and function as one unit.  In this regard,

disregard of corporate form is only warranted in extraordinary circumstances, and conclusory

allegations of dominance and control will not suffice.  *Societe D'Assurance De L'est SPLR v.*

*Citigroup Inc.*, No. 10 Civ. 4754 (JGK), 2011 WL 4056306 at *5 (S.D.N.Y. Sept. 13, 2011)

(internal quotation marks omitted).[7]  Piercing the corporate veil requires a showing that: 1) the

owner exercised complete dominion over the corporation with respect to the transaction at issue;

and 2) that such control was used to commit a wrong or fraud against the party seeking to pierce

the veil. *Id. at* 1, 5  (holding that this is the proper inquiry when determining if the American

parent of a subsidiary based in the Congo should be liable for a contract entered into by its

subsidiary); *Oppenheimer & Co. v. Deutsche Bank AG*, No. 09 Civ. 8154 (LAP),  2010 WL

743915 at *4 (S.D.N.Y. 2010); *McAnaney v. Astoria Fin. Corp.*, 665 F.Supp.2d. 132, 143

(E.D.N.Y. 2009).

---

[7]  The corporate veil can only be pierced when a parent and its subsidiary, by their conduct,
demonstrate an abandonment of separateness. *Oppenheimer & Co. v. Deutsche Bank AG*, No.
09 Civ. 8154 (LAP), 2010 WL 743915 at *4 (S.D.N.Y. Mar. 2, 2010) (holding that the
connection between Deutsche Bank AG and Deutsche Bank Securities, Inc. was not
sufficient to pierce the corporate veil and require Deutsche Bank AG to participate in
arbitration.); *see also*, *Baratta v.Kozlowski*, 94 A.D.2d  454, 456 (2nd Dep't 1983) ("The
Irving Bank was not a party to any contract with plaintiff and it may not be held liable for the
torts of its subsidiary because the complaint fails to allege that it exercised complete
domination and control over the subsidiary."); *McAnaney v. Astoria Financial Corp.*, 665
F.Supp.2d 132, 143 (E.D.N.Y. 2009) ("As a baseline matter, parent companies are generally
not liable for actions of their subsidiaries.").

Here, Plaintiff seeks to pierce the corporate veil and reach the accounts and information of CIBC's indirect subsidiaries without any regard for these well-established requirements. On the contrary, Plaintiff *admits* that FirstCaribbean is properly established as a partially owned subsidiary of CIBC. (Pl. Mem. at 1.) Plaintiff does not question FirstCaribbean's right to own banking subsidiaries such as First Cayman and Cayman TrustCo. Plaintiff does not suggest that any of FirstCaribbean's subsidiaries were formed for fraudulent purposes, and does not question whether FirstCaribbean and its subsidiaries observe all appropriate corporate formalities (as indeed they do.) (*see* Aylett Decl. ¶ 5)[8]

Unable to make a veil-piercing showing,[9] Plaintiff merely asserts, in conclusory fashion, that CIBC's ownership stake in FirstCaribbean, integration between the two companies, overlap in personnel, and inclusion of FirstCaribbean information in public reports prove that CIBC exercised complete dominion over FirstCaribbean. (Pl. Mem. at 13-15.) At most, this suggests in the words of the *Citigroup* decision, that CIBC exercised "the degree of control over [FirstCaribbean] that would be expected of a corporate parent," which is woefully insufficient to pierce the corporate veil. *Citigroup*, 2011 WL 4056306 at *6.[10]

---

[8]    The fact that CIBC, FirstCaribbean and First Cayman partially share a "CIBC" trade name does not provide a rationale for ignoring the corporate form. *Butler v. Stagecoach Group, PLC*, 72 A.D. 3d 1581, 1582 (3d Dep't 2010) (holding that a common trade name was not a basis upon which the corporate veil should be pierced); *Al Sayegh Bros. Trading, LLC v. Doral Trading and Export*, 219 F. Supp. 2d 285 (E.D.N.Y. 2002) (noting that the court was unaware of any case where a common trade name was a proper basis for piercing the corporate veil).

[9]    Even if the facts were different and the corporate veil could be pierced between CIBC and FirstCaribbean, Plaintiff would additionally have to make the requisite showing to pierce the corporate veil between FirstCaribbean and its Cayman Islands subsidiaries, a showing that Plaintiff has not even attempted.

[10]   *See also McAnaney*, 665 F.Supp. 2d. at 144 (mere ownership of controlling share of a subsidiary is "insufficient as a matter of law to establish alter ego liability of a parent
                                                                                                                   *(cont'd)*

Moreover, and critically, piercing the corporate veil also requires a showing that the parent's control over the subsidiary was used to commit a fraud or wrong against the plaintiff. Where there is no plausible way a parent could be said to have committed a wrong or fraud, this second requirement simply cannot be met. *See Id.* at *6 (noting that there was no plausible way Citigroup could be said to have committed fraud or wrongdoing against the plaintiff even if it did assert control over its subsidiary)  Here, Plaintiff concedes that CIBC has done nothing wrong. (Pl. Mem. at 3) ("For the avoidance of doubt, we are not at this point alleging that CIBC acted improperly...."). Plaintiff thus has no basis to set aside the corporate form of CIBC and its subsidiaries and pierce through two corporations simply to avoid having to establish jurisdiction over the appropriate party.

## IV.
### IN ALL EVENTS, PLAINTIFF HAS FAILED TO SERVE PROPER NOTICES ON THE ENTITY IN POSSESSION OF JUDGMENT DEBTOR'S PROPERTY, THEREBY INVALIDATING ANY RESTRAINT

Although relying upon CPLR 5225 as the basis for its application, Plaintiff has failed to strictly comply with the CPLR's detailed requirements. Article 52 provides specific instructions for the notices and forms that *must* served on garnishee banks and debtors to effectuate a restraint on property. *See* N.Y. CPLR §5222-a(b) (requiring judgment creditor to provide bank with an "exemption notice" and "two exemption claim forms"); *see also Midland Funding v. Singleton*, 935 N.Y.S.2d 844, 846-47 (Dist. Ct. Nassau County 2011). The purpose of this statute is to protect debtors from improper restraints on their property. *Cruz v. TD Bank, N.A.*, No. 10 Civ.

_____

(*cont'd from previous page*)
corporation."); *Deutsche Bank AG,* 2010 WL 743915 at *4 (Deutsche Bank AG's ownership of, and control over Deutsche Bank Securities, Inc.'s financial and operational policies, was merely "consistent with an ordinary stockholder-corporation relationship and is not indicative of an alter ego relationship.")

8026, 2012 WL 694267 at *4 (S.D.N.Y. Mar. 2, 2012).  If the requirements of Article 52 are not strictly followed, a restraint is invalid.  *Id.*.

Here, Plaintiff delivered to CIBC's New York branch papers related to this Order to Show Cause via e-mail on March 6, 2012, and by hand on March 7, 2012.  Plaintiff failed to serve CIBC with the exemption notice and exemption claim forms required by statute.  Seeking to cure its defect, Plaintiff subsequently sent CIBC's counsel the exemption notice and *one* copy of the exemption claim form, identifying CIBC and not FirstCaribbean or its subsidiaries.

As far as CIBC is aware, Plaintiff also has *completely failed* to serve any of the required documents upon FirstCaribbean, the bank named in Plaintiff's application, or on its separate Cayman Islands subsidiaries, the banks where any such accounts logically would be held.  By serving process on CIBC's New York office, Plaintiff has *not* effectuated service upon FirstCaribbean, First Cayman or Cayman TrustCo.  "It is hornbook law that service of process on a subsidiary does not constitute service on a parent corporation, nor does service on a parent constitute service on a subsidiary."  *In re Crespo*, 123 Misc.2d 862, 865 (Sup. Ct. New York County 1984); *see also Pappas & Marshall v. A.J. Ross Logistics*, 222 A.D.2d 424, 425 (2d Dep't 1995) (noting that a finding of agency for service purposes will not be inferred from the existence of a parent/subsidiary relationship).  Furthermore, notice to one bank does not represent notice to even a branch of that bank.  *John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08 Civ. 7834 (GEL) (DCP), 2009 WL 3003242, at *4 (S.D.N.Y. Sept. 15, 2009).

The very entity that Plaintiff alleges is in possession of funds and documents has never been served with any of the required forms.  As such, there simply is no valid restraint.

## **CONCLUSION**

For the foregoing reasons, third party garnishee Canadian Imperial Bank of Commerce respectfully requests that Plaintiffs application be denied in all respects and that the TRO be vacated in its entirety.

Dated:    New York, New York
          March 13, 2012

                                              Respectfully submitted,

                                              Scott D. Musoff
                                              (scott.musoff@skadden.com)
                                              Timothy G. Nelson
                                              (timothy.g.nelson@skadden.com)
                                              Gregory A. Litt
                                              (greg.litt@skadden.com

                                              SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                              Four Times Square
                                              New York, New York  10036
                                              (212) 735-3000

                                              Attorneys for Canadian Imperial
                                              Bank of Commerce

21